FOX ROTHSCHILD LLP
Yann Geron, Esquire
100 Park Avenue, Suite 1500
New York, New York 10017
Telephone: 212.878.7900
Facsimile: 212.692.0940
ygeron@foxrothschild.com

*Counsel to PricewaterhouseCoopers, Inc.,*
*Monitor to William Switzer & Associates, Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>WILLIAM SWITZER & ASSOCIATES, LTD.,<br><br>    Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No.: 11-_____ |

**DECLARATION OF MICHAEL J. VERMETTE IN SUPPORT OF PETITION FOR**
**RECOGNITION OF FOREIGN MAIN PROCEEDING PURSUANT TO**
**11 U.S.C. §§ 105(a), 1504, 1515, 1517, 1519, AND 1521**

  I, Michael J. Vermette, a Senior Vice President of PricewaterhouseCoopers, Inc.

("PWC"), in my capacity as monitor of William Switzer & Associates, Ltd. (the "Debtor"), in

support of the Debtor's Verified Petition for Recognition of Foreign Main Proceeding and

Related Relief Pursuant to 11 U.S.C. §§ 105(a), 1504, 1515, 1517, 1519, 1520, and 1521 (the

"Petition") hereby declare the following to be true and correct to the best of my knowledge,

information, and belief, based on my personal knowledge and/or review of pleading filed in this

case, contracts, documents, and reports prepared and/or maintained by the Debtor in the ordinary

course of its business.

## A.  The Debtor

1.  The Debtor, William Switzer & Associates Ltd. ("Switzer Ltd."), is a corporation formed pursuant to the laws of British Columbia, Canada, incorporated January 22, 1988.  The directors and shareholders of Switzer Ltd. are William Switzer, Allan Switzer, and Renee Switzer. Switzer Ltd. holds two wholly-owned subsidiaries, both incorporated in the United States:  (i) William Switzer & Associates Inc ("Switzer, Inc."), a corporation formed pursuant to the laws of the State of Illinois; and (ii) Charles Pollock Reproductions, Inc. ("Charles Pollock," and together with Switzer Ltd. and Switzer, Inc., the "Switzer Group"), a corporation formed pursuant to the law of the State of California.

### 1.  The Debtor's History and Business Lines

2.  Switzer Ltd. is the successor corporation of the family-owned and operated business founded by William Switzer in 1952 as a full-service interior design business.  Since 1978, the Switzer Group has evolved into a business specializing in the production of handmade furniture, including bespoke custom furnishings, fine quality reproductions, original house designs, the Lucien Rollin Collection (as detailed below), and the Charles Pollock collection (as detailed below).

3.  Switzer Group furniture is found in many exclusive homes and hotels world-wide.

4.  In addition to its main line of custom-designed furniture, Switzer Ltd. produces several additional lines of furniture targeted to different sections of the upper, exclusive end of the furnishings market.

#### a.  The Lucien Rollin Collection

5.  Lucien Rollin was a French designer during the height of the French Moderne and Art Deco periods of design.  Mr. Rollin first opened his own design studio in 1928, and in the

following years won numerous awards for his interior and furniture design featured at international fairs, prestigious buildings, embassies and ships of the time. Mr. Rollin died in 1993.

6. Following Mr. Rollin's death, Switzer Ltd. began negotiations with the estate of Mr. Rollin, and on or about July 20, 1998 entered into a licensing agreement (the "Lucien Rollin License") with Mr. Rollin's successors for the manufacture of furnishings utilising Mr. Rollin's designs.

7. The Lucien Rollin Licence, as amended December 15, 2003, and December 23, 2008, provides Switzer Ltd. with an exclusive, world-wide licence to produce and market furnishings created from Lucien Rollin's designs (the "Lucien Rollin Collection").

8. The Lucien Rollin Collection produced by the Switzer Group debuted in September 1999.

### b. Charles Pollock Reproductions

9. Charles Pollock was acquired by Switzer Ltd. in or around July 1999, from its namesake and founder. The company was founded in the early 1960s and specialized in fine antiques and fine antique reproductions.

10. The fine furnishings produced by Charles Pollock have been acquired by many famous Hollywood celebrities, as well as being sold throughout the world.

11. Charles Pollock's operations are distinct from that of Switzer Ltd. and Switzer Inc. It maintains its own office staff, manufacturing and warehouse in and around the Los Angeles area, which allows its unique design culture and manufacturing techniques to be maintained. Charles Pollock management reports directly to Switzer Ltd.'s management in Vancouver.

PH1 2822708v4 05/20/11

**2.    The Debtor's Business Operations, Capital Structure, and Events Leading to Filing**

      **a.    Distribution and Sales Channels**

12.    The Switzer Group originally marketed its furniture in its local Vancouver showroom, and through representation in showrooms owned by third parties (a "Rep Showroom"). The industry standard is that the owner of a Rep Showroom retains 25% of all of the sales made through that showroom.

13.    The advantage of using Rep Showrooms is that the overhead is not borne by the furniture manufacturer, thereby lessening its costs, and accordingly, its financial exposure. However, where a manufacturer does a large volume of sales it is often advantageous to have its own showroom as the retention of the 25% normally paid on all sales by a Rep Showroom more than offsets the additional overhead costs. Further, the manufacturer with its own showroom can act as a Rep Showroom for other lines of furniture, and earn the 25% commission on those additional sales.

14.    During the early part of the last decade, Switzer Group's sales were sufficiently high in the United States, and prospects for further sales seemed sufficiently probable, that it was decided that the Switzer Group would open a variety of showrooms in key markets in the United States. Accordingly, in or around the dates indicated in the table below, the Switzer Group entered into leases for premises for its own showrooms in the following US cities:

| Year of Commencement | City | Switzer Group Tenant Liable on Lease | Guarantor (if any) | Landlord |
|---|---|---|---|---|
| 2000 | New York City, New York | Switzer Ltd. | None | D&D Building Company LLC |
| 2001 | Dania Beach, Florida | Switzer Inc. | Switzer Ltd. | Design Center of the Americas, LLC |
| 2002 | Chicago, Illinois | Switzer Ltd. | None | Merchandise Mart L.L.C. |
| 2002 | Los Angles, California | Switzer Ltd. | None | Pacific Design Center 1, LLC |
| 2005 | San Francisco, California | Switzer Ltd. | William Switzer | Larry Wasserman |

(the "New York Lease", "Dania Lease", "Chicago Lease", "Los Angeles Lease" and "San Francisco Lease" respectively, and collectively the "US Leases").

15. The premises leased pursuant to the US Leases are presently used as showrooms (with the exception of the Dania Lease and the Los Angeles Lease, as discussed below) and order centers for all lines produced by the Switzer Group, as well as Rep Showrooms for various other furniture manufacturers.

16. Upon information and belief, the landlords under the New York Lease, Dania Lease and Los Angeles Lease are all subsidiaries or affiliates of Cohen Brothers Realty Corporation.

### b. Difficulties Faced by Luxury Industries and The Switzer Group

17. Several global factors beyond the Switzer Group's control have placed significant financial pressures on its business, and have necessitated changes in its business model in order to continue as a going concern.

PH1 2822708v4 05/20/11

18.     The financial crisis of the past several years has had a large negative effect on the luxury and custom furniture markets as a whole. Like many other manufacturers and retailers in this industry, the Switzer Group has suffered a dramatic drop in revenues. From 2009 to 2010, overall sales revenue for the Switzer Group decreased 50%. In addition to the financial pressure of significantly decreased revenue over a short period of time, this downturn has also caused the Switzer Group to accumulate a substantial amount of excess inventory.

19.     Further, the cost of the Switzer Group's production has increased as a result of instability in the global markets. The majority of the Switzer Group's sales are conducted in United States Dollars ("USD"). However, the majority of base production of furniture is produced for the Switzer Group by highly specialized craftsmen in Europe, and in particular Spain and Italy. These craftsmen are paid in Euros. Over the past decade, and in particular since the financial crisis, the value of the Euro has risen against the USD. This has resulted in foreign exchange pressure and losses for the Switzer Group which have placed an additional strain on profitability.

20.     The Switzer Group has undertaken significant cost-reductions in an effort to cope with reduced revenues, however a very high proportion of overhead costs are attributable to leases and salaries which are more difficult to alter without changing the Switzer Group's business model. The result of the above factors has been to significantly decrease the Switzer Group's profitability and the effectiveness of its business model.

c.     **The Current State of Switzer Ltd.**

21.     Switzer Ltd. is responsible for the production of the various product lines other than Charles Pollock. Switzer Ltd. is also the center of administration for the entire Switzer Group. As noted above, the production of the bases and frames for most of the furniture is

completed in Europe. These items are then shipped to Canada where they are finished by Switzer Ltd. in its Vancouver premises, either pursuant to a specific custom order, or for placement in a showroom.

22.     The Switzer Group main operations are out of leased premises on Alexander Street, in Vancouver, British Columbia (the "Alexander Premises"). It also stores raw stock in a building it owns on Cordova Street, in Vancouver, British Columbia (the "Cordova Property"). The Cordova Property is in the process of being sold (as further described herein).

i.     Employees

23.     Presently, Switzer Ltd. employs the following persons, all of whom are based in the Alexander Premises: (i) 7 people in the administration of the Switzer Group; (ii) 21 people finishing products that have been shipped from Europe; and (iii) 5 people in its showroom and fabric showroom.

ii.     Leases

24.     As the tenant under all of the US Leases other than the Dania Lease (on which it is a guarantor), as well as leases for the Switzer Group's main operations and showroom in the Alexander Premises (the "Vancouver Lease") and the main office and warehouse for Charles Pollock in Los Angeles, California (the "Charles Pollock Lease"), Switzer Ltd. has incurred substantial leasehold obligations allegedly totaling approximately $750,016.00, as well as future obligations under the various leases allegedly totaling $3,438,528.00. Switzer Ltd. Reserves all rights to contest any and all such lease claims in its CCAA proceedings, and nothing herein shall be construed as Switzer Ltd's conceding of any lease claim.

7

### iii.    Vancouver Lease Notice and Demand

25.    On or about May 4, 2011, Switzer Ltd. was served with a 10-day eviction notice and demand for payment pursuant to the Vancouver Lease. This notice expired, and the Vancouver landlord's rights of distraint commenced, on Saturday, May 14, 2011.

### iv.    Los Angeles Lease Termination and Settlement

26.    On or about February 16, 2011, Pacific Design Center 1, LLC (the "PDC"), the landlord, pursuant to the LA Lease, served Switzer Ltd. employees at the property with a 10-Day Notice to Pay Rent or Quit the Premises. Switzer Ltd. was unable to meet its rent obligations under the LA Lease and on or about March 29, 2011, was served with a complaint for unlawful detainer thereby commencing the PDC's civil action against Switzer Ltd. in the Superior Court of the State of California (the "California Court").

27.    On or about April 21, 2011, after lengthy negotiations, Switzer Ltd. and the PDC entered into an oral contract wherein Switzer Ltd. and the PDC agreed that Switzer Ltd. would vacate the LA premises by April 30, 2011, removing all of its property and consigned goods, the PDC would keep Switzer Ltd.'s security deposit, and both parties reserved their rights as to any and all legal or equitable causes of action.

28.    In reliance on this oral contract, Switzer Ltd. undertook extraordinary measures to arrange and hire movers, pack-up the premises, locate other showrooms to store and offer for sale the consigned goods, and to vacate the premises by April 30, 2011. On April 25, 2011, Switzer Ltd. began to vacate the premises and was able to move one truck of goods. On April 26, 2011, when trucks arrived to continue the move-out process, the PDC and its employees breached the oral contract by denying Switzer Ltd. and its movers access to the loading dock and freight elevator, preventing Switzer Ltd. from vacating the premises.

8

29.    On May 4, 2011, Switzer Ltd. answered the PDC's complaint for unlawful detainer and filed a counterclaim for damaged and injunctive relief for: (i) breach of oral contract; (ii) conversion; (iii) intentional interference with contractual relationship; (iv) negligent interference with contractual relationship; and (v) declaratory relief. By May 5, 2011, employees and contractors of Switzer Ltd. were permitted to complete the move out from the PDC. To date, the both the PDC's claims and Switzer Ltd.'s counterclaim remain pending before the California Court. At a pre-trial conference held on May 18, 2011, the California Court stayed the Switzer Group's litigation with the PDC for 90 days due to the Switzer Group's restructuring efforts.

v.    San Francisco Lease Re-Instatement

30.    On or about February 24, 2011, Larry Wassermann ("Wasserman"), the landlord and owner of the Showplace East (the "Showplace") where Switzer Ltd.'s San Francisco showroom is located, served a summons for unlawful detainer against Switzer Ltd., in the California Court.

31.    On March 4, 2011, Wasserman and Switzer Ltd. entered into a stipulation of judgment whereby Wasserman agreed to allow Switzer Ltd. to remain in possession of the Showplace property through May 1, 2011 for a payment of $50,000.00 (the "Initial Settlement"). Subsequent to the Initial Settlement, on or about May 11, 2011, Wasserman and Switzer Ltd. reached an agreement whereby on May 1, 2011, Switzer Ltd. will resume regular rent payments under the San Francisco Lease and that the lease will remain in effect until the termination of the San Francisco Lease. Further, William's personal guarantee remains in effect, and Wasserman has agreed to waive additional fees and costs to which he is entitled under the San Francisco Lease.

PH1 2822708v4 05/20/11

### vi. Banking Facilities

32.     Since 2006, the Switzer Group has used Bank of Montreal ("BMO") as its primary bank and lender.

33.     Switzer Ltd. was unable to meet or satisfy certain margining and other covenants under its prior loan agreements with BMO as a result of the financial difficulties discussed above.  BMO agreed not to call the loans of Switzer Ltd., and revised the terms of Switzer Ltd.'s obligations as set out on the term sheet dated January 13, 2011, as amended by the Amendment Agreement dated February 3, 2011 and the un-dated Amendment Agreement executed in May, 2011 (collectively the "Term Sheet").

34.     The Term Sheet provided, *inter alia*, that Switzer Ltd. was entitled to borrow from BMO the sum of $2,500,000.00 until (unless otherwise amended by BMO) April 30, 2011, at which time the total authorised amount was reduced to $2,250,000.00 until July 31, 2011. These amounts were subject to certain margining requirements, as set out in the Term Sheet.

35.     As security for obligations outstanding to it, BMO holds, *inter alia*, the following security:  (i) guarantees from Switzer Inc. and Charles Pollock; (ii) general security agreements and general assignment of book debts, registered as a first charge against the assets of Switzer Ltd., Switzer Inc. and Charles Pollock, respectively, in the *Personal Property Registry* of British Columbia; (iii) section 427 *Bank Act* security registered with the Bank of Canada in the sum of $2,500,000.00; (iv) filings pursuant to its security against the Switzer Group in the United States of America pursuant to the applicable state versions of the Uniform Commercial Code; (v) a collateral first mortgage against the Cordova Property; and (vi) a limited personal guarantee from William in the amount of $2,000,000.00.

PH1 2822708v4 05/20/11

36.     Prior to the sale of the Cordova Property (as described below) Switzer Ltd., is currently indebted to BMO in the sum of approximately $2,039,000.00.

### vii.     Other Debts and Payables

37.     Switzer Ltd. has further trade and other payables due to date totaling approximately $851,000.00, and total primary obligations of approximately $10,874,000.00.

38.     Payments to all employees of Switzer Ltd. and all government remittances are being made in the normal course of business, and the Switzer Group proposes to continue with this course of conduct during the proposed restructuring.

### d.     The Current State of Switzer Inc.

39.     Switzer Inc. does not produce furniture, and is primarily responsible for sales in the United States.

40.     Presently, Switzer Inc. employs seven people in the various United States showrooms.  This number represents a reduction from 11 people who were employed until the Dania and one Los Angeles showrooms were closed (as noted herein).

41.     Switzer Inc. is the tenant liable pursuant to the Dania Lease (which is guaranteed by Switzer Ltd.).

42.     In or around February, 2011, the landlord under the Dania Lease, Design Center of the Americas, LLC ("DCOTA"), defaulted under the lease by physically barring Switzer Ltd. from removing inventory items from the property by denying Switzer Ltd. access to the building's loading dock.  DCOTA's actions resulted in an impediment to Switzer Ltd.'s business activities which cased Switzer Ltd. economic loss, including preventing the delivery of products to customers for which they had already paid.  DCOTA took these actions contrary to the Dania Lease and Florida law.

11

43.     On or about February 22, 2011, DCOTA served Switzer Ltd. employees at the property with a three-day notice to pay $31,212.29 in back rent. Switzer Ltd. was unable to meet its rent obligations under the Dania Lease, and on March 31, 2011, DCOTA commenced a bifurcated civil action in the Circuit Court in and for the 17th Judicial Circuit, in and for Broward County, Florida (the "Florida Court") and served Switzer Ltd. employees at the property with two sets of legal process (i) a 5-Day Summons initiating a proceeding to evict Switzer Ltd. from its DCOTA showroom (the "Eviction Action") and (ii) a 20-Day Summons initiating a contact action to recover the amounts owed under the Dania Lease (the "Contract Action").

44.     On or about April 20, 2011, after lengthy negotiations to settle the Eviction Action, Switzer Ltd. and DCOTA entered into a Stipulated Final Judgment of Possession (the "Judgment of Possession") whereby Switzer, Ltd. agreed to a pay back rent and attorney's fees totaling $98,605.79 for the right to remain in possession of its DCOTA showroom through and including April 30, 2011; further, Switzer Ltd. would be afforded access to DCOTA's loading dock to enable its move out from the premises. On April 27, 2011, the Florida Court entered its order approving the Judgment of Possession.

45.     Switzer Inc. has further trade and other payables due currently totaling approximately $488,000.00, and total primary obligations of approximately $879,000.00.

46.     Payments to all employees of Switzer Inc. and all government remittances are being made in the normal course of business, and the Switzer Group proposes to continue with this course of conduct during the proposed restructuring.

PH1 2822708v4 05/20/11

### e. The Current State of Charles Pollock

47.     As indicated above, Charles Pollock operates its own office and warehouse, separate from Switzer Ltd. However, its product is marketed and sold in the Switzer Group's showrooms.

48.     Presently, Charles Pollock employs: (i) one person in sales in Chicago, Illinois; and (ii) two people in administration, one person in customer service and one person in their warehouse, all in Los Angeles.

49.     Charles Pollock has further trade and other payables due currently totalling approximately $269,000.00 and total primary obligations of approximately $612,000.00.

50.     Payments to all employees of Charles Pollock and all government remittances are being made in the normal course of business, and the Switzer Group proposes to continue with this course of conduct during the proposed restructuring.

## B. CCAA Proceedings and Plan of Arrangement

### 1. Pre-Filing Actions

51.     Recognizing its financial difficulties, the Switzer Group retained the services of PWC to help it address establish a plan for restructuring. The Switzer Group also retained restructuring counsel at Davis LLP in Canada and Fox Rothschild LLP in the United States to assist with a restructuring the business. Despite having worked with these experienced parties to avoid a court-supervised process since mid-February, 2011, the demands of the landlords in the United States and Canada have made it necessary to go forward with formal court proceedings.

52.     Switzer Ltd. has taken further steps to reduce its surplus inventory, including conducting a liquidation sale of showroom pieces through Maynards Industries ("Maynards"). It is anticipated that in a restructuring proceeding, Maynards will continue to play a key role in

liquidating the excess inventory in order to realize the substantial cash being tied up therein (the "Maynards Inventory Liquidation"), and to allow the Switzer Group's management to focus on restructuring its business.

53.     Further, 0910308 B.C. Ltd., a company owned by Renee and Allan Switzer, has agreed to purchase the Cordova Building from Switzer Ltd. at its fair market value of $1,175,000.00 (the "Cordova Sale"). The Cordova Sale, which has been approved by PWC as a prudent measure in restructuring the Switzer Group, is expected to realize proceeds which will be used to pay down the amounts owing to BMO as the secured creditor with a collateral mortgage on the building. This will reduce the obligations of Switzer Ltd. (and the obligations of the other members of the Switzer Group pursuant to their guarantees) and also allow the company to return its focus on its core business.

**2.     Current Liabilities**

54.     As set forth above, the Switzer Group has total liabilities of approximately $12,365,000.00, broken down as follows:

| Switzer Group Entity | Total Primary Obligations |
|---|---|
| Switzer Ltd. | $10,874,000.00 |
| Switzer Inc. | $   879,000.00 |
| Charles Pollock | $   612,000.00 |
| **Total** | **$12,365,000.00** |

55.     At this time the Switzer Group, and each of the entities thereof, are unable to pay their debts as they become due and owing.

**3.     The Plan of Arrangement**

56.     While the Switzer Group maintains its core business of furniture manufacturing remains viable, the changes in the global economy have made it necessary for the business to re-shape its organization and business model in order to return to profitability. William, Allan,

Renee Switzer and senior Switzer Group management have been working with PWC to develop a plan to reorganize the Switzer Group.

57.     The first, and perhaps most important requirement of any plan of arrangement will be for the Switzer Group to return to using Rep Showrooms to display and market its product.  As indicated above, the expenses of running its own showrooms are no longer viable given the Switzer Group's revenues.  It will be necessary under any restructuring plan for the Switzer Group to vacate the properties subject to the US Leases (with the exception of the San Francisco Lease).  This will result in the Switzer Group having the San Francisco showroom as its signature US showroom, the Charles Pollock location with its unique product remaining in Los Angeles, and all other Switzer Group showrooms in the United States will be closed.  The remainder of the business operations, including the Charles Pollock administration, will be centered in Vancouver, British Columbia.

58.     At the present time it is not feasible to switch manufacturing from the current artisans in Europe which manufacture the majority of the Switzer Group's furniture.  Given the necessity and corporate mandate of provide the highest -quality, custom products, losing the current artisan suppliers would be extremely detrimental to Switzer's business.  Several have been producing products for the Switzer Group in excess of 35 years, and for many the Switzer Group is their only customer.  The requirement to maintain these suppliers in order to continue the operation of the Switzer Group's core business, and the reliance these artisan suppliers for the majority or all of their revenue, makes it essential that the Switzer Group be able to pay these artisans their current and future accounts receivable in the normal course of business during the proposed restructuring, with the consent of the Monitor.  However, it is anticipated that finishing

in Canada will no longer be completed in-house, allowing the Switzer Group to reduce its space requirements substantially in Vancouver to a small showroom and administration office.

59.     The Lucien Rollin Collection is also a key component to the Switzer Group's core business, and will remain so for a re-focused Switzer Group following the proposed restructuring. The terms of the Lucien Rollin Licence Agreement provide that it can be terminated if royalty payments are not made, and such a termination during or following the proposed restructuring would be highly detrimental to the value of the Switzer Group.

60.     Much of the Switzer Groups' furniture is sold by sales people on a commission basis in Rep Showrooms and otherwise. It is critical to the Switzer Groups' continued sales and revenue, both during and following the proposed restructuring, that these parties continue marketing the Switzer Groups' products. In order to ensure this, it will be necessary to pay commissions accrued and owing in the ordinary course, including those accrued prior to the filing of this application and not yet paid. Should these parties not be paid their full commissions owing, it is likely that they will cease to market the Switzer Group's products to customers, and instead will market products from suppliers whose commission payments have not been interrupted. Further, these parties may not be willing to continue with the Switzer Group following a restructuring if their payments are interrupted.

### 4.     The CCAA Proceeding

61.     On May 13, 2011, the Honorable Madame Justice Gropper of the Supreme Court of British Columbia (the "Canadian Court"), entered the CCAA Initial Order (the "Canadian Order"), thereby commencing the Switzer Group's restructuring in Canada under the Companies' Creditors Arrangements Act, R.S.C. 1985, c. C-36 (the "CCAA"). A certified copy

of the Canadian Order which is in English in the original and; therefore need not be translated into English to satisfy Bankruptcy Code section 1515(d), is attached as Exhibit A.

### 5. Consent of PWC to Act as Monitor in the CCAA Proceeding

62. PWC has consented to be appointed monitor in the CCAA proceedings through the execution of a consent to act. A true and correct copy of PWC's consent to act is attached as Exhibit B.

## C. The Petition for Recognition

63. As set forth in this declaration and the Petition, PWC and the Debtor are able to establish the facts necessary to satisfy PWC's burden of demonstrating that the Canadian Proceeding is a foreign main proceeding. Accordingly, the Canadian Proceeding should be recognized as such and PWC and the Debtor should be granted the relief automatically available upon such recognition under the United States Bankruptcy Code.

64. On May 13, 2011, the Canadian Court made the Canadian Order thereby granting the relief set forth therein and initiating the Debtor's proceeding under the CCAA. The Canadian Proceeding is entitled to recognition as a foreign main proceeding under Bankruptcy Code chapter 15 because, among other things:

    a. The Canadian Proceeding is a foreign proceeding since the Canadian Proceeding is pending in the location of the Debtor's center of main interest;

    b. PWC is authorized to be the Debtor's foreign representative in this case pursuant to the Canadian Order;

    c. The Petition is being filed in accordance with the United States Bankruptcy Code; and

PH1 2822708v4 05/20/11

d.  I have been informed by United States counsel that the Petition meets the requirements the United States Bankruptcy Code.

### 1.     This Case Concerns a Foreign Proceeding

65.     The Canadian Proceeding is a foreign proceeding in which the assets and affairs of the Debtor is subject to control or supervision by the Canadian Court pursuant to the CCAA. The Canadian Order and PWC's consent to act as monitor authorize and appoint PWC as monitor.

66.     Upon commencement of the Canadian Proceeding, the Debtor's unsecured creditors are prohibited from commencing or continuing any legal proceedings or actions to enforce rights against the Debtor or its property absent relief from the Canadian Court.  As monitor, the Petitioner is and officer of the Canadian Court appointed to supervise the steps taken by the company while in CCAA proceedings, on behalf of all creditors.  While the debtor's management will remain in control of the company throughout these proceedings, PWC will assist management in dealing with the restructuring and other issues that may arise.  As part of the PWC's supervisory role, it will file periodic reports with the Canadian Court and creditors, including reports on any proposed disposition of assets.  Accordingly, I believe the Canadian Proceeding to be a foreign proceeding.

67.     Finally, the Debtor's senior management and equity holders, administrative offices, and main manufacturing center are all located in or around Vancouver, British Columbia, Canada.   Moreover, the Debtor is a British Columbia registered company governed by Canadian law, and has its registered office in Canada, and all the Debtor's U.S. employees report directly to management located in Canada.  Given these factors, I believe that the Canadian Proceeding

PH1 2822708v4 05/20/11

qualifies as a foreign main proceeding because it is pending in the country where the Debtor has the center of its main interests.

## 2. This Case Is Being Commenced by a Foreign Representative

68. This Chapter 15 case was commenced by the "foreign representative" of the Debtor duly authorized in the Canadian Proceeding. Acting in its capacity as monitor in the Canadian Proceeding, PWC is authorized to supervise the reorganization of the Debtor's assets and affairs, and to act as a representative in this chapter 15 proceeding.

69. As set forth herein, the PWC was authorized by the Canadian Court and appointed by consent of the Debtor to act as the Debtor's monitor. The Affidavit of Renee Switzer, President of Switzer Ltd., upon which the Canadian Court relied in making the Canadian Order, specifically contemplates that the PWC will make this application and act as the foreign representative with respect to the Debtor. By virtue of such authorization and appointment, PWC is serving as the Debtor's foreign representative in this chapter 15 case. Furthermore, PWC is the foreign representatives identified in the Canadian Order and Consent to Act as a foreign representative.

[*Intentionally Left Blank*]

PH1 2822708v4 05/20/11

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed on May 20, 2011.
Vancouver, British Columbia, Canada

_____
Michael J. Vermette

*Monitor of William Switzer &*
*Associates, Ltd.*

SWORN BEFORE ME AT THE
CITY OF VANCOUVER ON MAY 20 2011

_____

A COMMISSIONER FOR TAKING
AFFIDAVITS FOR BRITISH
COLUMBIA

MAGNUS C. VERBRUGGE
BARRISTER & SOLICITOR
1200 Waterfront Centre, 200 Burrard Street
P.O. Box 48600, Vancouver, Canada V7X 1T2
(604) 640-4198

Exhibit "A"



SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

MAY 1 3 2011

ENTERED

SUPREME COURT
OF BRITISH COLUMBIA
VANCOUVER REGISTRY

MAY 1 3 2011

NO. 5113206

VANCOUVER REGISTRY

IN THE SUPREME COURT OF BRITISH COLUMBIA

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND

IN THE MATTER OF THE BUSINESS CORPORATIONS ACT, S.B.C. 2002, c. 57, AS
AMENDED

AND

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF WILLIAM SWITZER & ASSOCIATES LTD.,
WILLIAM SWITZER & ASSOCIATES INC. and
CHARLES POLLOCK REPRODUCTIONS, INC.

PETITIONERS

## ORDER MADE AFTER APPLICATION
## (CCAA INITIAL ORDER)

| | | | |
|---|---|---|---|
| BEFORE | ) ) ) | THE HONOURABLE <br><br> MADAM JUSTICE GROPPER | ) ) ) | FRIDAY, THE 13TH DAY <br><br> OF MAY, 2011 |

ON THE APPLICATION of the Petitioners

☑ coming on for hearing at 800 Smithe Street, Vancouver, B.C., V6Z 2E1 on May 13, 2011 and
on hearing **Mary I. Buttery** and H. Lance Williams, counsel for the Petitioners and other counsel
as listed on Schedule "A" hereto:

**JURISDICTION**

1.    THIS COURT ORDERS AND DECLARES that the Petitioners are companies to which the
CCAA applies.

**PETITION HEARING**

2.    THIS COURT ORDERS that the hearing of the Petition in this proceeding be held at the
Courthouse at 800 Smithe Street, Vancouver, British Columbia at 10:00 a.m. on Friday, the 10th

day of June, 2011, provided that the service referred to in paragraph 46 of this Order occur no later than May 20, 2011.

3.     THIS COURT ORDERS that all of the relief provided for in the subsequent paragraphs of this Order is granted to the Petitioners on an interim basis only, and that the relief made in the subsequent paragraphs will expire at 11:59 p.m. (local Vancouver time) on June 10, 2011, unless extended by this Court at the hearing of the Petition which will occur on that date.

## POSSESSION OF PROPERTY AND OPERATIONS

4.     THIS COURT ORDERS that, subject to this Order and any further Order of this Court, the Petitioners shall remain in possession and control of their current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "Property"), and continue to carry on their business in the ordinary course and in a manner consistent with the preservation of their business (the "Business") and Property. The Petitioners shall be authorized and empowered to continue to retain and employ the employees, consultants, liquidators, agents, experts, accountants, counsel and such other persons (collectively "Assistants") currently retained or employed by them, with liberty to retain such further Assistants as they deem reasonably necessary or desirable in the ordinary course of business or for carrying out the terms of this Order.

5.     THIS COURT ORDERS that the Petitioners shall be entitled, but not required, to pay the following expenses which may have been incurred prior to the Filing Date:

    (a)     all outstanding wages, salaries, employee and pension benefits (including long and short term disability payments), vacation pay, bonuses and expenses (but excluding severance pay) payable before or after the Filing Date, in each case incurred in the ordinary course of business and consistent with the relevant compensation policies and arrangements existing at the time incurred (collectively "Wages");

    (b)     the fees and disbursements of any Assistants retained or employed by the Petitioners in respect of these proceedings, at their standard rates and charges, including payment of the fees and disbursements of legal counsel retained by the Petitioners, whenever and wherever incurred, in respect of:

        (i)     these proceedings or any other similar proceedings in other jurisdictions in which the Petitioners or any subsidiaries or affiliated companies of the Petitioners are domiciled;

        (ii)     any litigation in which the Petitioners are named as a party, whether commenced before or after the Filing Date;

        (iii)     any related corporate matters; and

    necessary to assist in the restructuring of the Petitioners;

    (c)     royalty payments accrued and owing in the ordinary course of business to Patrick Aubriot and Nathalie Aubriot (collectively the "Licensors") regarding the Lucien Rollin collection of furniture and pursuant to the agreement among the Licensors and

William Switzer & Associates Ltd. dated July 20, 1998, as amended October 29, 1999 and December 15, 2003;

(d)     commissions accrued and owing to any party for the sale of the Petitioners' products in the ordinary course of business; and

(e)     sums accrued and owing to the Petitioners' manufacturers in the ordinary course of business in a sum not to exceed 70,000 Euros with the consent of the Monitor.

6.     THIS COURT ORDERS that, except as otherwise provided herein, the Petitioners shall be entitled to pay all expenses reasonably incurred by the Petitioners in carrying on the Business in the ordinary course following the Filing Date, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)     all expenses reasonably incurred for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors' and officers' insurance), maintenance and security services;

(b)     all capital expenditures reasonably incurred for the preservation of the Property or the Business as approved by the Monitor, as hereinafter defined in paragraph 29;

(c)     all obligations incurred by the Petitioners after the Filing Date, including without limitation, with respect to goods and services actually supplied to the Petitioners following the date of this Order (including those under purchase orders outstanding at the Filing Date but excluding any interest on the Petitioners' obligations incurred prior to the Filing Date);

(d)     amounts outstanding to creditors for goods and services provided prior to the Filing Date where expressly authorized by this Order or any further Order of this Court; and

(e)     fees and disbursements of the kind referred to in paragraph 5(b) which may be incurred after the Filing Date.

(f)     with the consent of the Monitor, pay an amount not exceeding in the aggregate $25,000.00 to suppliers deemed to be critical to the ongoing operations of the Petitioners.

7.     THIS COURT ORDERS that the Petitioners are authorized to remit, in accordance with legal requirements, or pay:

(a)     any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from Wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes or any such claims which are to be paid pursuant to Section 18.2 of the CCAA;

(b)     all goods and services or other applicable sales taxes (collectively, "Sales Taxes") required to be remitted by the Petitioners in connection with the sale of goods and services by the Petitioners, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or collected prior to the date of this Order but not required to be remitted until on or after the date of this Order; and

(c)     any amount payable to the Crown in right of Canada or of any Province thereof or any political subdivision thereof or any other taxation authority in respect of municipal property taxes, municipal business taxes or other taxes, assessments or levies of any nature or kind which may at law be payable in priority to claims of secured creditors and which are attributable to or in respect of the carrying on of the Business by the Petitioners.

8.      THIS COURT ORDERS that the obligations to the Petitioners with respect to customer deposits outstanding as at the Filing Date shall be honoured by the Petitioners in the ordinary course, provided such deposits are applied toward the purchase of the Petitioners' product for which they were intended. In the event that the intended sale is not completed, those customers shall have a claim for the deposit monies paid in any Plan or Plans of Compromise and Arrangement.

9.      THIS COURT ORDERS that until such time as the Petitioners deliver a notice in writing to repudiate a real property lease in accordance with paragraph 13(b)(iv) of this Order (a "Notice of Repudiation"), the Petitioners shall pay all amounts constituting rent or payable as rent under real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable as rent to the landlord under the lease) based on the terms of existing lease arrangements or as otherwise may be negotiated between the Petitioners and the landlord from time to time, for the period commencing from and including the date of this Order (the "Rent"), twice-monthly in equal payments on the first and fifteenth day of the month in advance (but not in arrears).  On the date of the first of such payments, any arrears relating to the period commencing from and including the date of this Order shall also be paid.  Upon delivery of a Notice of Repudiation, the Petitioners shall pay all Rent due for the notice period stipulated in paragraph 13(b)(iv) of this Order, to the extent that Rent for such period has not already been paid.

10.     THIS COURT ORDERS that until such time as the Petitioners repudiate any equipment lease in accordance with paragraph 13(b)(v) of this Order, and provided that the equipment lease is a true lease and not a financing lease creating a security interest, the Petitioners may pay all amounts or payable under such leases based on the terms of existing lease arrangements or as otherwise may be negotiated by the Petitioners from time to time, for the period commencing from and including the date of this Order, but shall not pay any amount with respect to pre-Filing Date arrears.

11.     THIS COURT ORDERS that, except as specifically permitted herein, the Petitioners are hereby directed, until further Order of this Court:

(a)     to make no payments of principal, interest or otherwise on account of amounts owing by the Petitioners to any of their creditors as of the Filing Date except as authorized by this Order;

(b)       to grant no security interests, trust, mortgages, liens, charges or encumbrances upon or in respect of any of their Property, nor become guarantors or sureties, nor otherwise become liable in any manner with respect to any other person or entity except as authorized by this Order; and

(c)       to grant credit only to the customers of their business and then only for goods and services actually supplied to those customers and on payment terms ordinarily granted by the Petitioners in the usual course of their business, and only upon the customer agreeing that there is no right of set-off in respect of amounts owing for such goods and services against any debt owing by the Petitioners to such customers as of the Filing Date.

## FINANCIAL ARRANGEMENTS

12.    THIS COURT ORDERS that notwithstanding any other provision in this Order:

(a)       the Petitioners are hereby authorized and empowered to borrow, repay, reduce and re-borrow from Bank of Montreal (the "Lender") such amounts from time to time as the Petitioners consider necessary, and the Lender shall be entitled to revolve its loan facility (the "Lender Loan Facility") and collect interest, fees and costs on the Lender Loan Facility, subject to such amendments as are agreed between the Lender and the Petitioners;

(b)       the Lender Loan Facility and all other credit facilities provided by the Lender to the Petitioners (collectively the "Loan Facilities") shall be secured by the same charge (the "Lender Charge") as secured the Loan Facilities as at the Filing Date;

(c)       the Petitioners are authorized to deal with the Lender in respect of the Loan Facilities on such terms as may be negotiated and agreed upon between the Petitioners and the Lender;

(d)       the Petitioners are authorized to pay the net proceeds from the sale referenced in paragraph 13(b)(viii) below to the Lender in reduction and partial satisfaction of the Loan Facilities; and

(e)       the Petitioners are authorized to make such other payments to the Lender in connection with the payout of the Loan Facilities as may be agreed upon between the Petitioners and the Lender.

## RESTRUCTURING

13.    THIS COURT ORDERS that, subject to the terms of this Order, the Petitioners shall remain in possession of their Property and Business, provided that:

(a)       subject to 13(b)(viii) herein, they shall not sell or otherwise dispose of any of their Property or Business outside of the ordinary course of business except pursuant to this paragraph or as may be authorized by an Order of the Court; and

(b) they shall have the right, subject to the consent of the Monitor, to proceed with an orderly downsizing of the Business and operations, including without limitation, the right to:

 (i) permanently or temporarily cease, downsize or shut down any of its Business or operations, and to dispose of redundant or non-material assets (including, without limitation, by any Assistants retained by the Petitioners) not exceeding a value of $250,000 in any one transaction or $2,000,000 in the aggregate;

 (ii) terminate the employment of such of their employees or temporarily lay off such of their employees as it deems appropriate on such terms as may be agreed upon between the Petitioners and such employee, or failing such agreement, to deal with the consequences thereof in the Plan;

 (iii) terminate such of their supplier arrangements as it deems appropriate;

 (iv) in accordance with paragraphs 14 and 15 of this Order, vacate, abandon or quit the whole but not part of any leased premises and/or repudiate any real property lease and any ancillary agreements relating to any leased premises, on not less than seven (7) days notice in writing to the relevant landlord on such terms as may be agreed upon between the Petitioners and such landlord, or failing such agreement, to deal with the consequences thereof in the Plan;

 (v) repudiate such leases of equipment as they deem to be unnecessary for their business, on such terms as may be agreed upon between the Petitioners and the lessor of such equipment, or failing such agreement, to deal with the consequences thereof in the Plan;

 (vi) terminate or repudiate such of its arrangements or agreements of any nature whatsoever as the Petitioners deem appropriate, on such terms as may be agreed upon between the Petitioners and such counter-parties, or failing such agreement, to deal with the consequences thereof in the Plan;

 (vii) pursue all sources of refinancing and offers for material parts of their Business or Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing or any sale, except as permitted by subparagraph (b)(i), above; and

 (viii) complete the sale of the Property known municipally as 701 East Cordova Street, Vancouver, BC;

all of the foregoing to permit the Petitioners to proceed with an orderly restructuring of the Business (the "Restructuring").

14. THIS COURT ORDERS that the Petitioners shall provide each of the relevant landlords with notice of the Petitioners' intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal. The relevant landlord shall be entitled to have a representative present on the leased premises to observe such removal and, if the landlord

disputes the Petitioners' entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any secured creditors who claim a security interest in the fixtures, such landlord and the Petitioners, or by further Order of this Court upon application by the Petitioners on at least two (2) clear days' notice to such landlord and any such secured creditors. If the Petitioners repudiate the lease governing such leased premises in accordance with paragraph 13(b)(iv) of this Order, they shall not be required to pay Rent under such lease pending resolution of any such dispute (other than Rent payable for the notice period provided for in paragraph 13(b)(iv) of this Order), and the repudiation of the lease shall be without prejudice to the Petitioners' claim to the fixtures in dispute.

15.     THIS COURT ORDERS that if a Notice of Repudiation is delivered, then (a) during the notice period prior to the effective time of the repudiation, the landlord may show the affected leased premises to prospective tenants during normal business hours, on giving the Petitioners and the Monitor 24 hours prior written notice, and (b) at the effective time of the repudiation, the landlord shall be entitled to take possession of any such leased premises without waiver of or prejudice to any claims or rights such landlord may have against the Petitioners in respect of such lease or leased premises and such landlord shall be entitled to notify the Petitioners of the basis on which it is taking possession and to gain possession of and re-lease such leased premises to any third party or parties on such terms as such landlord considers advisable, provided that nothing herein shall relieve such landlord of its obligation to mitigate any damages claimed in connection therewith.

16.     THIS COURT DECLARES that, pursuant to Section 7(3)(c) of the *Personal Information Protection and Electronics Documents Act*, S.C. 2000, c. 5 and Section 18(1)(o) of the *Personal Information Protection Act*, S.B.C. 2003, c. 63, and any regulations promulgated under authority of either Act, as applicable (the "Relevant Enactment"), the Petitioners are permitted, in the course of these proceedings, to disclose personal information of identifiable individuals in its possession or control to stakeholders, its advisors, prospective investors, financiers, buyers or strategic partners (collectively, "Third Parties"), but only to the extent desirable or required to negotiate and complete the Restructuring or to prepare and implement the Plan or transactions for that purpose; provided that the Third Parties to whom such personal information is disclosed enter into confidentiality agreements with the Petitioners binding them in the same manner and to the same extent with respect to the collection, use and disclosure of that information as if they were an organization as defined under the Relevant Enactment, and limiting the use of such information to the extent desirable or required to negotiate and complete the Restructuring or to prepare and implement the Plan or transactions for that purpose, and attorning to the jurisdiction of this Court for the purposes of that agreement.  Upon the completion of the use of personal information for the limited purposes set out herein, the Third Parties shall return the personal information to the Petitioners or destroy it. If the Third Parties acquire personal information as part of the Restructuring or the preparation and implementation of the Plan or transactions in furtherance thereof, such Third Parties may, subject to this paragraph and any Relevant Enactment, continue to use the personal information in a manner which is in all respects identical to the prior use thereof by the Petitioners.

## NO PROCEEDINGS AGAINST THE PETITIONERS OR MONITOR

17.     THIS COURT ORDERS that until and including June 10, 2011, or such later date as this Court may order (the "Stay Period"), no action, suit or proceeding in any court or tribunal (each, a "Proceeding") shall be commenced or continued against or in respect of the Petitioners, or affecting

the Business or the Property, except with the written consent of the Petitioners or with leave of this Court, and any and all Proceedings currently under way against or in respect of the Petitioners or affecting the Business or the Property are hereby stayed and suspended during the Stay Period pending further Order of this Court.

18.    THIS COURT ORDERS that during the Stay Period, no Proceeding shall be commenced against or in respect of the Monitor, in its capacity as Monitor, except with the written consent of the Monitor or with leave of this Court.

## NO EXERCISE OF RIGHTS OR REMEDIES

19.    THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other persons or entities having notice of this Order (all of the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the Petitioners or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the Petitioners and the Monitor or leave of this Court, provided that nothing in this paragraph shall (i) empower the Petitioners to carry on any business which the Petitioners are not lawfully entitled to carry on, (ii) affect the rights and remedies of a regulatory body with respect to any investigation in respect of the Petitioners, Property or the Business or Proceeding taken or to be taken by a regulatory body against the Petitioners or with respect to the Property or Business, except when it is seeking, directly or indirectly, to enforce any of its rights as a secured creditor or an unsecured creditor, (iii) prevent the filing of any registration to preserve or perfect a mortgage, charge or security interest (subject to the provisions of Section 18.5 of the CCAA relating to the priority of statutory Crown securities) or (iv) prevent the registration or filing of a lien or claim for lien or the commencement of a Proceeding to protect lien or other rights that might otherwise be barred or extinguished by the effluxion of time, provided that no further step shall be taken in respect of such lien, claim for lien or Proceeding except for service of the initiating documentation on the Petitioners.

20.    THIS COURT ORDERS that the rights and remedies hereby stayed shall include all rights or remedies relating to mortgages, charges, trusts, security interests, securities, instruments, debentures, notes or bonds issued by or on behalf of the Petitioners.

## NO INTERFERENCE WITH RIGHTS

21.    THIS COURT ORDERS that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Petitioners, except with the written consent of the Petitioners and the Monitor or leave of this Court.

## CONTINUATION OF SERVICES

22.    THIS COURT ORDERS that during the Stay Period, all Persons having agreements with the Petitioners or mandates under an enactment for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, insurance, transportation, services, utility or other services to the Business or the Petitioners, are hereby restrained until further Order of this Court from

discontinuing, altering, interfering with, breaching or terminating any such agreement for the supply of such goods or services as may be required by the Petitioners, and that the Petitioners shall be entitled to the continued use of their current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges (excluding amounts outstanding as at the Filing Date) for all such goods or services received by the Petitioners after the date of this Order are paid by the Petitioners in accordance with normal payment practices of the Petitioners or such other arrangements as may be agreed upon by the supplier or service provider and the Petitioners, or as may be ordered by this Court.

23.     THIS COURT ORDERS that during the Stay Period and subject to the other provisions of this Order, no creditor of or other Person who has dealt or may deal with the Petitioners shall be under any obligation after the date of this Order to enter into new or renewed arrangements with the Petitioners, except that:

(a)     any Person who has provided policies of insurance or indemnity at the request of the Petitioners shall be required to continue or to renew such policies of insurance or indemnities following the date of this Order provided that the Petitioners makes payment of the premiums (other than premiums outstanding as at the Filing Date) on the usual commercial terms (as if these proceedings had not been commenced) and otherwise complies with the provisions of such policies; and

(b)     any Person who has supplied goods and/or services to the Petitioners essential to the operations of the Petitioners shall be required to continue or to renew any contracts or agreements or otherwise continue the arrangement for the provision of such supply or service, provided that the Petitioners pay the prices or charges under the agreements for such goods or services (excluding amounts outstanding as at the Filing Date) incurred after the Filing Date concurrently with such supply, or alternatively when the same become due in accordance with the payment terms negotiated between the Petitioners and such Person subsequent to the Filing Date, and provided that such terms shall be the usual or common commercial terms charged by such Person to others for the same or similar supplies and services and, in any event, such terms to be no more onerous than those which applied to the Petitioners before these proceedings had been commenced for such supplies and services.

24.     THIS COURT ORDERS that, notwithstanding any provision in this Order, no creditor of the Petitioners shall be under any obligation after the making of this Order to advance or re-advance any monies or otherwise extend any credit to the Petitioners.

25.     The Petitioners may, by written advice from their counsel of record herein and with the written consent of the Monitor, agree to waive any of the protections provided to it herein.

## PROCEEDINGS AGAINST DIRECTORS AND OFFICERS

26.     THIS COURT ORDERS that during the Stay Period, and except as permitted by subsection 11.5(1) of the CCAA, no Proceeding may be commenced or continued against any of the current or future directors and officers of the Petitioners with respect to any claim against the directors and officers that arose before the date hereof and that relates to any obligations of the Petitioners

whereby the directors and officers are alleged under any law to be liable in their capacity as directors and officers for the payment or performance of such obligations.

## DIRECTORS AND OFFICERS INDEMNIFICATION

27.     THIS COURT ORDERS that the Petitioners are permitted to indemnify its present and future directors and officers and each of them from all claims, costs, charges and expenses relating to the failure of the Petitioners, after the date hereof, to make payments of such obligations which they sustain or incur by reason of or in relation to their respective capacities as directors and officers of the Petitioners (and irrespective of whether such obligations of the Petitioners arose before or after the Filing Date), provided that such indemnity shall apply only to the extent that the directors and officers have acted honestly and in good faith with a view to the best interests of the Petitioners, have not committed wilful misconduct or gross negligence, have not breached their related fiduciary duties, and have not authorized actions or conduct inconsistent with the terms of this Order or any other order subsequently pronounced in these proceedings.

## APPOINTMENT OF MONITOR

28.     THIS COURT ORDERS that PricewaterhouseCoopers Inc. is hereby appointed pursuant to the CCAA as the monitor (the "Monitor"), an officer of this Court, to monitor the Property and the Petitioners' conduct of the Business with the powers and obligations set out in the CCAA or set forth herein, and that the Petitioners and their shareholders, officers, directors, and Assistants shall cooperate fully with the Monitor in the exercise of its powers and rights and discharge of its obligations.

29.     THIS COURT ORDERS that the Monitor, in addition to its rights and obligations specifically set out in the CCAA, is hereby directed and empowered to:

(a)     monitor the Petitioners' receipts and disbursements;

(b)     report to this Court and the creditors at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, the Restructuring and such other matters as may be relevant to the proceedings herein;

(c)     advise the Petitioners as to the preparation of the Petitioners' cash flow statements and reporting and such financial and other information as required by the Lender;

(d)     advise the Petitioners as to the development of any Plan authorized to be presented to the creditors, and any amendments to the Plan;

(e)     have full and complete access to the Property, books, records and management, employees and advisors of the Petitioners, to the extent required to perform its duties arising under this Order;

(f)     be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order;

(g) perform such other duties as are required by this Order or by this Court from time to time;

(h) take all reasonable steps to ensure that the Petitioners make payment of all required amounts from its bank accounts or otherwise in the manner directed in this Order; and

(i) provide assistance to the Petitioners with respect to the Restructuring and the downsizing.

30. THIS COURT ORDERS that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, or by inadvertence in relation to the due exercise of powers or performance of duties under this Order, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof, and nothing in this Order shall be construed as resulting in the Monitor being an employer or a successor employer, within the meaning of any statute, regulation or rule of law or equity, for any purpose whatsoever.

31. THIS COURT ORDERS that the Monitor shall provide the Lender and any other creditor of the Petitioners with information provided by the Petitioners in response to reasonable requests for information made in writing by the Lender or such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information provided by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Petitioners is confidential, the Monitor shall not provide such information to the Lender or the creditors unless otherwise directed by this Court or on such terms as the Monitor and the Petitioners may agree.

32. THIS COURT ORDERS that, in addition to the rights and protections specifically afforded to the Monitor under the CCAA or which the Monitor possesses as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the rights and protections given to the Monitor by any applicable legislation.

33. THIS COURT ORDERS that the Monitor need not file security with this Court for the due and proper exercise and performance of its powers and duties as Monitor.

34. THIS COURT ORDERS that the Monitor shall be at liberty to post any report relating to the subject matter of this proceeding on the Monitor's web site at www.pwc.com/car-switzer in lieu of mailing such reports to creditors of the Petitioners or to any other interested parties.

## ADMINISTRATION CHARGE

35. THIS COURT ORDERS that the Monitor, counsel to the Monitor, if any, and counsel to the Petitioners (wherever situate) shall be paid their reasonable fees and disbursements, in each case at their standard rates and charges, by the Petitioners as part of the cost of these proceedings. The Petitioners are hereby authorized and directed to pay the accounts of the Monitor, counsel to the Monitor and counsel to the Petitioners on a periodic basis and, in addition, the Petitioners are hereby authorized to pay to the Monitor, counsel to the Monitor, and counsel to the Petitioners,

retainers not exceeding $75,000.00 to be held by them as security for payment of their respective fees and disbursements outstanding from time to time.

36.     THIS COURT ORDERS that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the British Columbia Supreme Court and may be heard on a summary basis.

37.     THIS COURT ORDERS that the Monitor, counsel to the Monitor, if any, and counsel to the Petitioners (wherever situate) shall be entitled to the benefits of, and are hereby granted, a charge (the "Administration Charge") on the Property, which charge shall not exceed an aggregate amount of $250,000, as security for payment of their respective fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order in respect of these proceedings. The Administration Charge shall have the priority set out in paragraphs 40 and 42 hereof.

## VALIDITY AND PRIORITY OF ADMINISTRATIVE CHARGE

38.     THIS COURT ORDERS that the filing, recording, registration or perfection of the Administration Charge shall not be required, and the Administration Charge shall, notwithstanding any lack of filing, recording, registering or perfection, be valid and enforceable for all purposes, including as against any right, title or interest filed, recorded, registered or perfected before or after the Administration Charge comes into existence.

39.     THIS COURT ORDERS that the Administration Charge (as constituted and defined herein) shall constitute a charge on the Property and shall rank in priority to all other security interests, trusts, liens, mortgages, charges and encumbrances, statutory or otherwise (collectively, "Encumbrances"), in favour of any Person.

40.     THIS COURT ORDERS that except as otherwise expressly provided herein, or as may be approved by this Court, the Petitioners shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with the Administration Charge, unless the Petitioners obtain the prior written consent of the Monitor and the beneficiaries of the Administration Charge.

41.     THIS COURT ORDERS that the Administration Charge shall not be rendered invalid or unenforceable and the rights and remedies arising therefrom shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to *Bankruptcy and Insolvency Act* ("BIA"), or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; or (d) any negative covenants, prohibitions or other similar provisions or lack of consent with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan document, lease, mortgage, security agreement, debenture, sublease, offer to lease or other agreement (collectively, an "Agreement") which binds the Petitioners; and notwithstanding any provision to the contrary in any Agreement:

(a)     neither the creation of the Administration Charge nor the execution, delivery, perfection, registration or performance of any documents relating thereto shall create

or be deemed to constitute a breach by the Petitioners of any Agreement to which it is a party; and

(b) none of the beneficiaries of Administrative Charges shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from the creation of the Charges.

42. THIS COURT ORDERS that the Administration Charge created by this Order over leases of real property in Canada shall only be a Charge against the Petitioners' interest in such real property leases.

## SERVICE AND NOTICE

43. THIS COURT ORDERS that the Petitioners be at liberty to serve this Order, the Petition, the Notice of Hearing of Petition, the Affidavit #1 of Renee Switzer and any other pleadings in this proceeding on any creditor or shareholder of the Petitioners, or any other interested party, other than employees and creditors to which the Petitioners owe less than $250.00:

(a) by delivering a copy of same to the last address, facsimile number or electronic mail address, known to the Petitioners, if any, communicated by such creditor, shareholder or party to the Petitioners; and

(b) by causing an advertisement to be placed in one edition of the Financial Post describing these proceedings; and

(c) by posting a copy of the pleadings on the Monitor's website.

The Monitor is relieved of its obligation under Section 24(1)(a) of the CCAA to provide similar notice, other than to supervise this process.

44. THIS COURT ORDERS that counsel of record who provide an email address in an Appearance filed in these proceedings shall be deemed to have consented to delivery of documents by any party by email unless objection is made before or at the time of the hearing of the Petition.

45. THIS COURT ORDERS that the Petitioners and the Monitor be at liberty to serve the documents referred to in paragraph 46 of this Order, any other materials and orders in these proceedings, any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or fax transmission to the Petitioner's creditors at their respective addresses as last shown on the records of the Petitioners, and any such service or notice by courier, personal delivery or fax transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

46. THIS COURT ORDERS that notwithstanding paragraphs 43, 44 and 45 of this Order, service of the Petition, the Notice of Hearing, the Affidavit #1 of Renee Switzer this Order and any other pleadings in this proceeding, shall be made on the federal and British Columbia Crowns in accordance with the *Crown Liability and Proceedings Act*, R.S.C. 1985, c. C-50, and regulations thereto, in respect of the federal Crown, and the *Crown Proceeding Act*, R.S.B.C. 1996, c. 89, in respect of the British Columbia Crown.

**GENERAL**

47.     THIS COURT ORDERS that the Petitioners or the Monitor may from time to time apply to this Court for advice and directions in the discharge of their respective powers, duties and obligations hereunder.

48.     THIS COURT ORDERS that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Petitioners, the Business or the Property.

49.     THIS COURT ORDERS that this Order and any other orders in these proceedings shall have full force and effect in all provinces and territories of Canada and shall be binding on all creditors of the Petitioners, wherever situate. This Court seeks and requests the aid and recognition of other Canadian and foreign Courts and administrative bodies including any Court or administrative tribunal of any Federal or State Court or administrative body in the United States of America, to act in aid of and to be complementary to this Court in carrying out the terms of this Order where required.

50.     THIS COURT ORDERS that each of the Petitioners and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order. In particular, the Monitor shall be authorized as a foreign representative of the Petitioners to apply to the United States Bankruptcy Court for relief pursuant to Chapter 15 of the *United States Bankruptcy Code*, 11 U.S.C. §§ 101-1330, as amended, if required.

51.     THIS COURT FURTHER ORDERS that the Petitioners may (subject to the provisions of the CCAA and the BIA) at any time file a voluntary assignment in bankruptcy or a proposal pursuant to the commercial reorganization provisions of the BIA if and when the Petitioners determine that such a filing is appropriate.

52.     THIS COURT FURTHER ORDERS that the Petitioners are hereby at liberty to apply for such further interim or interlocutory relief as to it may be advisable within the time for the filing of an Appearance by the creditors of the Petitioners in this proceeding.

53.     THIS COURT FURTHER ORDERS that any interested Person or creditor of the Petitioners may file an Appearance in this proceeding and the time limited for filing such an Appearance for such person or creditor of the Petitioners outside of British Columbia shall be 14 days from the date of service upon such Person or creditor.

54.     THIS COURT FURTHER ORDERS that liberty is reserved to any interested person or party to apply to this Court on two (2) clear days' notice to the Petitioners and such persons who have filed Appearances for such further Order of this Court or for variation of this Order or otherwise as may be advised.

55.     THIS COURT FURTHER ORDERS that short leave is hereby granted to allow the hearing of an application on two (2) clear days' notice after delivery of the Notice of Motion, affidavits in support and Notice of Hearing, subject to the Court in its discretion further abridging or extending the time for service. Outlines, Responses and Chambers Records shall not be required to be exchanged by counsel or filed in this proceeding.

56. THIS COURT FURTHER ORDERS that endorsement of this Order by counsel appearing on this application is hereby dispensed with.

57. THIS COURT ORDERS that this Order and all of its provisions are effective as of 12:01 a.m. local Vancouver time, the date of this Order.

BY THE COURT

DISTRICT REGISTRAR

APPROVED AS TO FORM:

Davis LLP (Mary I.A. Buttery)
Counsel for the Petitioners

Certified a true copy according to
the records of the Supreme Court
at Vancouver, B.C.
This ____ day of _____ 20__
_____
Authorized Signing Officer

# Schedule "A"

(List of Counsel)

| Name of Counsel | Representing |
| --- | --- |
| Geoffrey Thompson | PricewaterhouseCoopers Inc. |
| Colin Emslie | Bank of Montreal |
| | |
| | |
| | |

NO. _____
VANCOUVER REGISTRY

IN THE SUPREME COURT OF BRITISH COLUMBIA

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND

IN THE MATTER OF THE BUSINESS
CORPORATIONS ACT, S.B.C. 2002, c.57, AS
AMENDED

AND

IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT
OF WILLIAM SWITZER & ASSOCIATES LTD.,
WILLIAM SWITZER & ASSOCIATES INC. and
CHARLES POLLOCK REPRODUCTIONS, INC.

PETITIONERS

---

# ORDER MADE AFTER APPLICATION
# (CCAA INITIAL ORDER)

---

DAVIS LLP
Barristers & Solicitors
2800 Park Place
666 Burrard Street
Vancouver, BC V6C 2Z7

Tel. No. 604.687.9444
Fax No. 604.687.1612

File No. 81563-00001                    MUB/sxl

Davis:8885674.6

Exhibit "B"

IN THE SUPREME COURT OF BRITISH COLUMBIA

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND

IN THE MATTER OF THE *BUSINESS CORPORATIONS ACT*, S.B.C. 2002, c. 57

AND

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF WILLIAM
SWITZER & ASSOCIATES LTD., WILLIAM SWITZER & ASSOCIATES INC. and
CHARLES POLLOCK REPRODUCTIONS, INC.

PETITIONERS

## CONSENT TO ACT

**PRICEWATERHOUSECOOPERS INC.**, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.C-36, as amended ("**CCAA**"), does hereby consent to act as Monitor in respect of the within CCAA application of William Switzer & Associates Ltd., William Switzer & Associates Inc., and Charles Pollock Reproductions, Inc.

**PRICEWATERHOUSECOOPERS INC.**

Per: _____

Michael Vermette, C.A., CIRP